In the Matter of **SEATRADE CORPORATION**, Kulukundis Maritime Industries, Inc., et al., Debtors.

No. 63 B 216, etc.

United States District Court
S. D. New York.
May 4, 1966.

Webster, Sheffield, Fleischman, Hitchcock & Chrystie, New York City, for trustee, Isaac N. P. Stokes and James V. Ryan, New York City, of counsel.

Robert M. Morgenthau, U. S. Atty., by Irwin B. Robins, Asst. U. S. Atty., for the United States.

Haight, Gardner, Poor & Havens, New York City, for Chemical Bank New York Trust Company, Richard B. Barnett, New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for Esso International, Alabama Drydock, and others, Richard H. McKenna, Bronx, N. Y., of counsel.

Schulman, Abarbanel & Kroner, New York City, for Seafarers' Welfare and Vacation Plans and others, Arthur Abarbanel, New York City, of counsel.

Bigham, Englar, Jones & Houston, New York City, for NBC and others, T. R. Giuttari, New York City, of counsel.

Hill, Rivkins, Lewis & Warburton, New York City, for cargo claimants, Henry J. V. Werner, New York City, of counsel.

## MEMORANDUM

CROAKE, District Judge.

This is a motion by the Government to confirm the Report of the Hon. Edward J. Ryan, Referee in Bankruptcy, acting as Special Master, filed February 9, 1966, recommending that the application of the Government for an order directing consolidation of the captioned proceedings into a single proceeding, merger of the assets and liabilities of all the debtors and amendment of the title of the proceedings accordingly, be granted. A three-day trial before the Referee was held; the direct case of the Government consuming the majority of this time.[1] Papers in opposition to the instant motion have been filed on behalf of the Chemical Bank New York Trust Company, as trustee for bondholders, and also by counsel on behalf of various wage claimants, Seafarers Welfare Plan, Sea-

---

1. See p. 4 of the transcript of the hearing before the court (hereinafter "Tr.") and the transcript of the proceedings before the Referee.

Both objectants appeared before the Referee. Counsel for the wage claimants, et al., was the only party who put in a case in opposition. That consisted of recalling for direct examination by him one of the witnesses for the Government and introduction into evidence of one document, a copy of a plan submitted to the court by the trustees and offered solely for the purpose of showing that it was such a plan. See pp. 362-3 of the transcript of the proceedings before the Referee. See also p. 337 thereof, where counsel for the Chemical Bank asserted that he would not put in a case. In response to questions by the court, Counsel for Chemical stated that no testimony or documentary proof was declined by the Referee, that he did not wish the proceedings reopened, and that he was satisfied that he had had the opportunity to put in all the evidence he wished to put in before the Referee. Tr. 32-3, 37 and 43.

farers Vacation Plan, *et al.*[2] The trustees support the application of the Government and request certain minor alterations in conclusion of law #2. Oral argument was requested by the two objectants and a hearing upon the Report was held before the undersigned on April 13, 1966.

The facts, in summary, as found by the Referee, are as follows:[3]

The debtors, who were all in the shipping business, were almost entirely owned, either directly or indirectly, by Manuel E. Kulukundis (hereinafter Kulukundis) and his wife.[4] They were operated with a frequent disregard of the usual corporate formalities and with essentially one administration.[5]

The operation was also as a single economic unit with essentially one pool of funds.[6] Debtors obtained funds from each other without the usual legal formalities.[7] There were transfers of assets from debtor companies to each other without consideration.[8] There was satisfaction by debtors, as well as by Kulukundis himself, of each other's obligations to third parties.[9] So also, there were frequent guarantees by the debtors, and also by Kulukundis, of each other's obligations.[10]

All of the debtors were treated from an accounting standpoint as one company.[11] Hence, it would be unreasonable in terms of cost and time to separate the companies and indeed such task would be a practical impossibility.[12] Even were the contemplated audit steps undertaken, there would be no guarantee that the situations of the debtors would be fairly reflected by the books.[13] Were the assets and liabilities of the debtors to be merged, a complete audit would not be necessary.[14]

Finally, it was found that "no specific instances could be shown to demonstrate that particular creditors would be unfairly dealt with on a consolidated basis," and that "no substantial evidence was adduced to support the contention that the assets of the Title XI companies should be deemed assets of the debtor-corporations."[15]

2. Counsel for various cargo claimants also appeared at the hearing on the Report and stated his position in Opposition. Tr. 83-5.

3. The Referee adopted the proposed findings submitted by the Government in addition to the findings contained in his Report. For convenience, the former will be referred to as the findings and the latter as the Report.

4. Finding A and Chart A following Finding 1.

5. Finding A, Chart A following Finding 1, Findings 2-5 and Report, p. 2, ¶2.

6. Finding B, 7-25, Chart B following Finding 7 and Report, p. 2, ¶2. See also Findings 26-9 as to the relationship between Kulukundis and the debtors.

7. Finding 9.

8. Finding 14.

9. Findings 17-19, 29, Report, p. 2, ¶2.

10. Findings 22-3, 27-8.

11. Finding 6.
See also the citation to the testimony of James S. Smith, a certified public accountant and partner in the firm of Peat, Marwick, Mitchell & Co., who was employed by the trustees to examine the books and records of the debtors at pp. 211-212 of the minutes of the proceedings before the Referee, as follows:
"Q. Mr. Smith, let me ask you another question: Would you say from an accounting standpoint the debtor companies were treated as a single unit?
"A. Well, of course, each of the debtor companies maintained its own set of books, but as I previously stated, there were entries back and forth between these companies so that you might very well consider them as one company.
"Q. From an accounting standpoint?
"A. Right."

12. Finding D, 30-36; Report, pp. 2-3.

13. Finding 35, p. 14.

14. Finding 35, p. 13.

15. Report, p. 4, ¶2. As to the Title XI companies, see infra, p. 702.

The following conclusions of law, as proposed by the Government, were made:[16]

"1. The Court has jurisdiction to consolidate proceedings and merge assets and liabilities of the Debtor Companies. Stone v. Eacho, 127 F.2d 284 (4th Cir.) [petition for rehearing denied, 128 F.2d 16 (1942)], cert. denied 317 U.S. 635 [63 S.Ct. 54, 87 L.Ed. 512] (1942). See also In re Todd Bldg. Corp., 172 F.2d 254 (7th Cir. 1949). Cf. Soviero v. The Franklin National Bank of Long Island, 328 F. 2d 446 (2d Cir. 1964).

"2. The Debtor Companies were operated as a single economic unit; their funds were pooled; their assets were used indiscriminately to provide funds for each other or to secure each other's obligations; from a formal corporate and financial standpoint their separate corporate entities were [frequently] ignored; from an accounting standpoint, they were one company; therefore, [for purposes of these reorganization proceedings and any ensuing proceedings involving the Debtor Companies under the bankruptcy laws] their separate corporate entities should be disregarded and their assets and liabilities merged. Soviero v. The Franklin National Bank of Long Island, supra; In re Pittsburgh Rys. Co., 155 F.2d 477 (3rd Cir. 1946); Stone v. Eacho, supra; Fish v. East, 114 F.2d 177 (10th Cir. 1940).

"3. Although no fraud or hindrance to creditors need be shown in the organization of the companies, Soviero v. The Franklin National Bank of Long Island, supra; In re Plymouth Dyeing Co., 323 F.2d 134 (3rd Cir. 1963), the facts here amply demonstrate the harm to be suffered by creditors unless the assets and liabilities are pooled and the inter-Debtor Company debt eliminated.

"4. No evidence has been introduced which tends to prove which creditors, if any, might be adversely affected by the proposed consolidation and the extent, if any, of such alleged harm. Cf. Hollander v. Henry, 186 F.2d 582 (2d Cir. 1951).

"5. The assets and liabilities of the Debtor Companies should be merged and the proceedings consolidated into a single proceeding."

There appears to be no serious dispute over the matter of consolidation for administrative purposes.[17] Rather, the objections are made to the recommendation that the assets and liabilities of the debtors be merged.

The case upon which the movant primarily relies and which is indeed largely dispositive of the matter is Soviero v. Franklin National Bank, 328 F.2d 446 (2d Cir. 1964). *Soviero* was an application by the trustee in bankruptcy of the Raphan Carpet Corporation for an adjudication that the assets of thirteen separate corporations each bearing "Raphan" in the corporate name (designated as the "Affiliates") and of a realty corporation ("Realty") in fact belonged to the bankrupt and for an order granting leave to sell the fixtures of certain affiliates free and clear of liens and encumbrances. Franklin Bank appeared in opposition, alleging that the fixtures were owned by the affiliates, claiming a lien on the fixtures of those affiliates which had executed chattel mortgages securing a loan which it had made to the bankrupt, and contending that the Referee in Bankruptcy lacked jurisdiction to summarily adjudicate title to adversely held property without a plenary suit. After a hearing, the Referee found in favor of the trustee, which findings and turnover order were confirmed by the District Court. Upon appeal, the order of the District Court was affirmed.

16. The additions proposed by the trustees to conclusion #2 shall be indicated in brackets.

17. See Tr. 26–7. See also p. 2 of the Memorandum of Law submitted on behalf of Chemical and in which counsel for the wage claimants, et al., expressed his concurrence by letter to the court dated April 1, 1966.

The facts surrounding the various corporations were not disputed and, as stated by Judge Moore, writing for the Court, were as follows:

"The Referee found that Henry S. Raphan and Herman Raphan were President and Secretary, respectively, the sole directors and stockholders of the bankrupt, the Affiliates and Realty. The Affiliates, like the bankrupt, were engaged in selling carpeting at retail. Realty, as the name suggests, owned the land and building where the bankrupt conducted business. The bankrupt paid the monies to finance the organization of the Affiliates and Realty. Although each corporation filed separate tax returns, individual accounting records were kept by the same staff of bookkeepers at the bankrupt's place of business. None of the corporations maintained corporate minutes reflecting their activities. Henry S. Raphan informed creditors that the bankrupt was a consolidated enterprise and issued a consolidated financial statement which listed, without separation, assets of the Affiliates and Realty as those of the bankrupt. The Affiliates had no working capital and whenever they required funds they were provided by the bankrupt with bookkeeping entries setting up the payments as loans and exchanges. When one Affiliate failed, the bankrupt paid the losses. In almost all instances, the bankrupt signed and remained liable on the Affiliates' leases, provided security deposits where necessary, and at times paid rent for some of them.

"The Affiliates were situated in various cities in New York, Connecticut and New Jersey, while the bankrupt was located on Long Island. Although each Affiliate maintained a bank account from which it paid local obligations, such as rent and utilities, the proceeds of their carpet sales were turned over to the bankrupt for deposit in its account. The Affiliates sold only by sample. Inventories were arbitrarily assigned to each one at the end of the year where they were reflected in the consolidated financial statement and relied upon for tax purposes. Suppliers shipped merchandise directly to the Affiliates, but billed, and were paid by, the bankrupt. The bankrupt paid all labor charges for installation of carpets sold by the Affiliates, their advertising charges, union dues and welfare payments, insurance and accounting charges, and at the end of the year charged each Affiliate with an arbitrary portion thereof by bookkeeping entries. All guarantees given to purchasers were in the bankrupt's name and did not mention the Affiliate which made the sale. The bankrupt's stationery and advertising referred to the Affiliates as branches.

"The Referee found that the bankrupt had conveyed gratuitously to Realty its only asset, the land and building where the bankrupt was located. The bankrupt was the sole tenant of the property, and no lease existed and no rental was paid. Payment of principal and interest on mortgages, taxes, insurance and other expenses of Realty was made by the bankrupt by issuing checks in the exact amount required to Realty which in turn would issue its own check for the same sum.

"From these and many other facts, the Referee concluded that the Affiliates and Realty were but instrumentalities of the bankrupt with no separate existence of their own. Consequently, there existed a unity of interest and ownership common to all corporations, and that to adhere to the separate corporate entities theory would result in an injustice to the bankrupt's creditors."

The first question reached by the Court was the propriety of the exercise of summary jurisdiction, that is, whether the adverse claims of corporate separateness presented such fair doubt or reasonable controversy as to necessitate a plenary suit. This was obviously an-

swered in the negative, the Court stating that:

"It is difficult to imagine a better example of commingling of assets and functions and of the flagrant disregard of corporate forms than as here demonstrated by the bankrupt. One gains the distinct impression that the bankrupt held up the veils of the fourteen collateral corporations primarily, if not solely, for the benefit of the tax gatherer, but otherwise completely disregarded them. Even Salome's could not have been more diaphanous. On these facts, we are convinced that the claims of individual corporate entities advanced for the Affiliates and Realty are 'without color of merit, and a mere pretense.'" 328 F.2d at 448. (Citations omitted.)

As to the propriety of the turnover order, the Court spoke as follows:

"A turnover order is 'a judicial innovation by which the court [of bankruptcy] seeks efficiently and expeditiously to accomplish ends prescribed by the statute.' * * *. We cannot agree with the Bank's contention that the corporate veils may be pierced only where the Referee finds that the subsidiary corporations were organized to defraud or hinder creditors. Cf. Bankruptcy Act, § 67(d) 11 U.S.C.A. § 107 (d). Contra, Maule Industries Inc. v. Gerstel, 232 F.2d 294 (5th Cir. 1956). In Stone v. Eacho, 127 F.2d 284 (4th Cir.), cert. denied, 317 U.S. 635, 63 S.Ct. 54, 87 L.Ed. 512 (1942), where the facts closely resembled those of the instant case, the court affirmed the issuance of the turnover order, ignoring the corporate entity of a subsidiary corporation, for only then could 'all the creditors receive that equality of treatment which it is the purpose of the bankruptcy act to afford.' 127 F.2d at 288. A similar conclusion is fully warranted here." 328 F.2d at 448–449.

This Court has departed from its usual practice by the above quotation of substantially the entire opinion in *Soviero* in light of the striking similarity between the facts which were there held to warrant a disregard of the corporate entities and those present herein. Indeed, if there is distinction between the situations, it would be one which calls even more strongly for piercing the corporate veils in the instant case.

This matter has been pending for some period prior to the hearing on the motion to confirm and the Court has availed itself of the opportunity thus presented for perusal of the objections filed and examination of the record before the Referee. The objections are unpersuasive. Moreover, no useful purpose would be served, nor is the Court disposed to further lengthen this memorandum by a discussion of the many points raised or of the standard with which a review of the findings of fact should proceed.[18] Accordingly, the discussion shall be confined to the essence of the position of the objectants, as indicated in the memorandum submitted and at the hearing before the undersigned.

Initially, it might be noted that counsel for Chemical concedes the pattern of intermingling of funds.[19] It is contended that a showing of fraud is a prerequisite to a piercing of the corporate veil and in

---

18. As to that scope of review, see pp. 5–12 of the able and comprehensive memorandum submitted on behalf of the Government.

19. See pp. 11–12 of the memorandum, in which counsel for the wage claimants has concurred. See also Tr. pp. 33–4, 35 and 39. For example, at pp. 33–4, in commenting upon conclusion of law #2, it was asserted that:
"On the first part of it, we concede that the companies were operated largely as a single economic unit. We do not dispute that."

At pp. 35 and 9, counsel responded as indicated to the following questions put by the Court:
"Did the funds intermingle?
Apparently, yes."
"Do you seriously say that there was no intermingling of funds among these corporations?
No, I do not say that. I say there was intermingling of funds."
At the hearing, counsel for the wage claimants disputed the existence of such pattern.

support, Soviero, supra, Maule Industries, Inc. v. Gerstel, 232 F.2d 294 (5th Cir. 1956), and at the hearing, Stone v. Eacho, supra, were cited. The fashion in which these citations establish for this Circuit the position urged is not apparent. *Maule Industries* does indeed state that "the petition and the proof must show that the corporation whose property is sought to be brought into the bankruptcy proceeding was organized or used to hinder, delay or defraud the creditors of the bankrupt, and constitutes mere 'legal paraphernalia' observing form only and not existing in substance or reality as a separate corporate entity." 232 F.2d at 294. However, as indicated, supra, at p. 701, *Maule* was cited for this position as contrary to the one taken by the Court of Appeals for this Circuit in *Soviero* when it stated that:

"We cannot agree with the Bank's contention that the corporate veils may be pierced only where the Referee finds that the subsidiary corporations were organized to defraud or hinder creditors." 328 F.2d at 448.

It is also urged in opposition that creditors of certain of the debtors, particularly of Seatrade Corporation, would be adversely affected by consolidation. Assuming arguendo that such fact had been demonstrated, its significance is not readily appreciated in view of *Soviero*, where creditors of the solvent sister corporations were transformed into creditors of the bankrupt. However, and in any event, it does not appear that the objectants have established the factual basis upon which this argument would be predicated.[20] So also, in the light of *Soviero*, of the facts found herein, and of the nature of the record below, the persuasiveness of the position urged that consolidation should not be had because of the speculative nature of its effects is not apparent.[21]

As to the matter of the related companies, including the so-called "Title XI" companies, the contention that their inclusion in the consolidation is a prerequisite to a granting of the relief sought is rejected. Suffice it to note that, as to the Title XI companies, the assets of two of them, Tankers & Tramps Corp. and Overseas Oil Transport Corp., will be included in the consolidation by reason of the fact that they are 100 percent owned subsidiaries of Kulukundis Maritime Industries, Inc., a debtor herein. As to the third, Newport Tankers Corp., approximately one-half of the outstanding stock is owned by KMI, which stock is asserted by the Government to be pledged by KMI to secure one of its obligations.

Various additional arguments in opposition were raised at the hearing and in the memorandum. They have been examined and are not persuasive of a conclusion that the instant motion be denied.

---

20. In support of their factual assertion, several pages in the transcript of the proceedings before the Referee, primary among which are pp. 385–6, paragraph 117 of the Interim Report of the Trustees, dated November 30, 1965, and the statements of the accountants have been cited. Upon examination, these do not appear to sustain the position urged. However, assuming for the moment that one of the debtors would in fact remain with available assets in the absence of a merger, for such fact to avail the objectants to any degree, it would seem necessary to demonstrate that the presence of assets in that corporation was *not* a result of the established pattern of intermingling of funds, which demonstration has obviously not been made.

21. The court might parenthetically note the remarks of counsel for the trustees at pp. 74–5 regarding the fact that the trustees had considered "a plan of action along the lines that I understand Mr. Barnett proposed, namely, that we should go ahead with the liquidation and postpone these questions of merger until later," and his reference to the hearing before the undersigned on December 2, 1965, where the course in fact determined upon was presented to the court. See also the transcript of that hearing where counsel joined with the Government in suggesting to the court that the question of consolidation be proceeded with first.

The trustees support the application of the Government. Their proposed alterations in conclusion of law #2 are apparently offered solely out of what might be characterized as an abundance of caution so as to make explicit what is implicit in these proceedings. At the instant hearing, counsel for both the movant and for Chemical stated that they had no objections to the proposal.[22] However, counsel for various creditors and insurance companies, while not objecting to the proposed additions, expressed concern over the "connotations" in the memorandum filed in support.[23] So also, the court had directed attention to this aspect of the proposed changes, what might be termed as their "legislative history" and expressed concern over both the conservation of the assets of the debtors and over whether the proposed changes could affect the interests of parties not before the court.[24] Counsel for the trustees spoke upon the proposal,[25] and in a letter to the court dated April 29, 1966, copies of which were sent to various counsel who had appeared at the hearings in this matter stated, in part as follows:

"Various situations may arise, in admiralty proceedings or other proceedings not involving the administration of the Bankruptcy Act, where the issue will be presented as to whether the debtor corporations should be treated as having been separate corporate entitles [sic] or not. Examples were given on pages 3 and 4 of our above-mentioned memorandum of April 1, 1966. The question now before this Court is whether the assets and liabilities of these corporations should be merged for purposes of the administration of the Bankruptcy Act. This Court has, of course, no jurisdiction to make a decision that would be binding in the other proceedings, but it is to be expected that the decision of this Court will be called to the attention of the courts sitting in the other proceedings.

"We submit that a decision to treat the separate corporations as one in this matter should not imply that they either should or should not be so treated for other purposes. Our memorandum in support of the proposed changes was not intended to connote anything else.

"To make it clear that it is not the intention of this Court to influence, one way or the other, the determination of the issue of separate or consolidated treatment of the corporations for purposes other than the administration of the Bankruptcy Act, we believe that it is desirable to adopt the proposed modification of the conclusions of law."

It was also requested "that the record of the hearing of April 13 be reopened to permit inclusion of this letter as part thereof."

In the light of the purpose of the proposed changes and the request by counsel to amplify his remarks on the record, the addition of the letter to the record of the hearing would appear a sufficient method by which such amplification might be made. Accordingly, the request is granted and the letter is being forwarded to the Clerk of the Court with a request that it be marked in evidence as Trustees' Exhibit #1.

As to the proposed changes themselves, manifestly this court is determining only the issue now presented. The objections to the Report of the Referee recommending merger have been examined and found wanting, and the motion of the Government to confirm the Report is granted. In view of the purpose of the changes proposed by the trustees, their commendable concern over preservation of the estate of the debtors, and the absence of objection to the alterations, the request to amend conclusion of law #2 as indicated is granted.

Counsel may submit an order on appropriate notice.

22. Tr. 43–6.

23. Tr. 65–70.

24. Tr. 81–2.

25. Tr. 78–80.